T.C. Memo. 2020-108

UNITED STATES TAX COURT

EDWARD J. DUFFY AND SHANNON L. DUFFY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8711-16.                      Filed July 13, 2020.

In 2009, Ps began renting out a property (Property 1) that they had previously used as a vacation home. In 2011, Ps sold Property 1. JPMC, a bank that held debt secured by the property, agreed to accept an amount of the sale proceeds less than the balance due in full satisfaction of the debt. In 2013, WF, another bank, agreed to cancel debt secured by Property 2, which Ps used as their principal residence. For 2012 through 2014, Ps claimed loss deductions from IM, a limited liability company of which P-H was a member, as well as deductions for expenses of IM that P-H paid without reimbursement. R disallowed Ps' deduction of a loss from their sale of Property 1, determined that they had unreported income from the cancellation of their debts to JPMC and WF, disallowed the losses and other deductions Ps claimed from P-H's involvement in IM, determined that P-H owed self-employment tax on guaranteed payments he received from IM, and determined accuracy-related penalties under I.R.C. sec. 6662(a). To demonstrate compliance with the requirement of I.R.C. sec. 6751(b)(1) for supervisory approval of penalties, R submitted a form signed by an individual whom the

[*2] parties stipulated to be "the manager or supervisor of one or more of the auditing revenue agents".

Held: Even accepting that Ps' rental of Property 1 constituted a trade or business, they did not establish that their basis in the property exceeded the proceeds from its sale because they presented no evidence as to the property's value when they began renting it out. See sec. 1.165-9(b)(2), Income Tax Regs.

Held, further, because Ps' debt to JPMC was nonrecourse, the discharge of the indebtedness is included in their amount realized on the sale of Property 1 and did not give rise to cancellation of indebtedness income. See sec. 1.1001-2(a), Income Tax Regs.

Held, further, Ps did not realize income from the cancellation of their debt to WF to the extent that they were insolvent when the debt was canceled. I.R.C. sec. 108(a)(1)(B), (3).

Held, further, Ps did not establish that IM allocated to P-H an ordinary loss for 2012; P-H's basis in his interest in IM was sufficient to allow him to deduct the full amount of the ordinary loss IM allocated to him for 2013 without limitation by I.R.C. sec. 704(d); and P-H's basis in IM was sufficient to allow him to deduct a sufficient portion of the loss IM allocated to him for 2014 to eliminate the deficiency R determined.

Held, further, Ps are not allowed to deduct the expenses of IM that P-H allegedly paid without reimbursement because Ps did not substantiate those expenses.

Held, further, P-H is liable for self-employment tax on the guaranteed payments he received from IM in 2012 but not those he received in 2013 or 2014; even assuming that net earnings from self-employment can be reduced by partnership losses only to the extent they are deductible under I.R.C. sec. 704(d), P-H was entitled to deduct losses from IM for each year sufficient to offset the guaranteed payments he received in that year.

**[*3]**    Held, further, R did not meet his burden of establishing compliance with I.R.C. sec. 6751(b)(1), because he did not demonstrate that the individual who signed the civil penalty approval form was "the immediate supervisor of the individual" who made the determination to assess penalties.

Kevin O'Connell, for petitioner Shannon L. Duffy.

Edward J. Duffy, pro se.

Nhi T. Luu, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By a notice of deficiency dated January 19, 2016, respondent determined deficiencies in petitioners' Federal income tax of $44,514 for 2009, $40,469 for 2010, $318,580 for 2011, $59,022 for 2012, $198,329 for 2013, and $1,544 for 2014.  Respondent also determined accuracy-related penalties of $7,943 for 2009, $8,094 for 2010, $63,716 for 2011, $11,804 for 2012, $39,648 for 2013, and $109 for 2014.[1]  After concessions by the parties we must decide (1) whether petitioners are entitled to deduct an ordinary loss of $971,988 from their sale in March 2011 of residential property in Gearhart,

_____

[1]All dollar amounts are rounded to the nearest dollar.

[*4] Oregon (Gearhart property), (2) whether petitioners must include in their taxable income for 2011, in connection with the sale of the Gearhart property, income from the discharge of indebtedness that property secured, (3) whether petitioners are entitled to deduct losses they reported from their rental of the Gearhart property, (4) whether petitioners must include in their taxable income for 2013 income from the discharge of a home equity line of credit secured by their principal residence in Portland, Oregon (Portland residence), (5) whether petitioners are entitled to deduct all or a portion of the losses allocated to Mr. Duffy by Impact Medical, LLC (Impact Medical), (6) whether petitioners are entitled to deduct other losses reported on Schedules E, Supplemental Income and Loss, of the returns they filed for 2012, 2013, and 2014, (7) whether Mr. Duffy is liable for self-employment tax on guaranteed payments he received from Impact Medical, and (8) whether petitioners are liable for the accuracy-related penalties respondent determined. Petitioners bear the burden of proof. See Rule 142(a).[2]

---

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

**[*5]**                               FINDINGS OF FACT

<u>The Gearhart Property</u>

   <u>Purchase, Financing, and Rental</u>

   Petitioners bought the Gearhart property in 2006 for $2 million. In accordance with the contract governing the purchase, petitioners paid the sellers a total of $430,500 but were unable to pay the remaining balance of the purchase price when it came due in July 2008.

   In September 2008, petitioners borrowed $1.4 million from JPMorgan Chase Bank, N.A. (JPMorgan Chase), and used the proceeds to pay part of the amount they owed to the sellers. In documentation prepared in connection with the JPMorgan Chase loan, petitioners characterized the Gearhart property as a second residence. The application petitioners submitted to JPMorgan Chase, dated September 15, 2008, includes the mortgage on the Portland residence in a list of their then-existing liabilities and gives its unpaid balance, at that time, as $470,749.

   At trial, Mrs. Duffy testified that, during 2009 and 2010, she and her husband rented the Gearhart property to family and acquaintances. Until then, they had used the property as a vacation home.

**[*6]** <u>Sale and Cancellation of JPMorgan Chase Debt</u>

Petitioners sold the Gearhart property in March 2011 for $800,000. JPMorgan Chase agreed to accept $750,841 of the proceeds in full satisfaction of the mortgage loan that encumbered the property. The documents which the parties stipulated regarding petitioners' sale of the Gearhart property do not include any judicial filings by JPMorgan Chase and make no reference to judicial proceedings to enforce petitioners' obligation to the bank.

<u>Petitioners' Financial Condition in March 2011</u>

In support of their claim to have been insolvent in March 2011 when the JPMorgan Chase debt was canceled, Mrs. Duffy provided testimony concerning her and her husband's assets and liabilities at that time. According to that testimony, Mr. Duffy maintained a retirement savings account that had a balance of $395,000 when he liquidated it in 2011. Petitioners also owned, among other things, "a 2009 Chevy Suburban and a 2007 Jeep Commander." Mrs. Duffy estimated that the Jeep was worth "probably $14,000 or so" in March 2011 and agreed that valuing the Suburban at $48,000 would be fair.

Regarding petitioners' liabilities in March 2011, Mrs. Duffy testified that she and her husband owed $200,000 on a home equity line of credit secured by the Gearhart property and credit card debt of $65,000. She also mentioned auto loans,

[*7] testifying that the Suburban was subject to a loan of "[p]robably close to $22,000 or more" and that the loan on the Jeep was "10 to 12,000".

Impact Medical

During the 2000s, Mr. Duffy worked as a highly compensated salesman and consultant for a medical equipment company. In 2009, however, he was moved to a management position that paid him less. The following year, Mr. Duffy lost his job entirely. Mr. Duffy remained unemployed, receiving unemployment insurance he described as "minimal", until February 2011, when he started Impact Medical.

Mr. Duffy was initially the sole member of Impact Medical, a limited liability company. He formed the entity to design and manufacture equipment to alleviate a medical condition known as deep vein thrombosis, which involves the formation of blood clots in a patient's lower extremities. Both petitioners testified that Mr. Duffy funded his initial investment in Impact Medical with $50,000-$55,000 of the proceeds from the liquidation of his retirement savings account. In addition, Impact Medical received a loan of about $250,000 from a friend of Mr. Duffy's, Richard Edelson.

During 2012, Dr. Edelson converted a loan to Impact Medical into an equity investment and became a member of the entity. According to Mr. Duffy's testimony, he (Mr. Duffy) made additional investments in 2012 through 2014.

[*8] The parties stipulated that Edward Murphy, Mr. Duffy's cousin, provided Impact Medical with a check for $50,000 in December 2012 and made a wire transfer to the partnership of $450,000 in January 2013. They also stipulated Mr. Duffy's execution, in January 2013, of a promissory note for $500,000 payable to Mr. Murphy. Mr. Duffy and Dr. Edelson remained the only two owners of Impact Medical through the end of 2014.

Mr. Duffy testified that he served as Impact Medical's manager and, as such, was obligated to run its day-to-day operations. He understood, on the basis of advice from legal counsel, that he had authority to make advances to the entity by paying its expenses. He also claims to have discussed the issue of reimbursement with Dr. Edelson.

Cancellation of Wells Fargo Debt; Petitioners' Lifestyle and Financial Condition in October 2013

On October 28, 2013, Wells Fargo Bank N.A. (Wells Fargo) forgave $391,532 of indebtedness petitioners owed on a home equity line of credit secured by the Portland residence. Both petitioners testified that they were insolvent when the Wells Fargo debt was canceled.

Mrs. Duffy testified that the Portland residence was worth "[p]robably around $750,000" in October 2013. She acknowledged that one of the documents

**[*9]** included in the record is an itemized list of personal property covered by petitioners' homeowners' insurance policy on the Portland residence in effect between December 18, 2012, and December 18, 2013. The list includes various items of jewelry valued at $130,311, objects of fine art valued at $1,140, and silverware valued at $9,863. Mrs. Duffy explained that, because the policy provided coverage in a "blanket dollar amount", she had not been scrupulous in keeping the itemized list up to date. By October 2013, she had lost some of the items of jewelry on the list and sold the rest to raise money after her husband lost his job. Among the lost items was a wedding ring, valued at about $16,000, that she had replaced by October 2013.

When petitioners sold the Gearhart property, a security interest securing an indebtedness to Oswego Bank was transferred to the Portland residence and remained in place in October 2013. According to Mrs. Duffy's testimony, by 2013 she and her husband had been unable to reduce the credit card debt that had been $65,000 in 2011.

After liquidating his retirement account in 2011, investing $50,000 of the proceeds in Impact Medical, and paying off part of the Wells Fargo loan, Mr. Duffy used the balance of the proceeds to pay family living expenses. Those expenses included tuition payable to the private schools at which petitioners had

[*10] enrolled their children (and which they further supported with donations) and Mr. Duffy's membership in a Portland country club.

Tax Reporting

2009 and 2010 Returns as Originally Filed

Petitioners reported adjusted gross income of $261,181 on their Federal income tax return for 2009 as originally filed. Schedule E of that return reported a loss of $135,959 from their rental of the Gearhart property. The reported loss equals the difference between $9,500 of rents received and expenses of $145,459, comprising $92,037 of mortgage interest, taxes of $5,590, and depreciation of $47,832. Petitioners treated the loss as a nondeductible passive activity loss.

Petitioners reported adjusted gross income of $266,324 on their 2010 return as originally filed. Schedule E of that return reported a loss of $65,490 from their rental of the Gearhart property. The reported loss equals the difference between $3,200 of rents received and expenses of $68,690, comprising mortgage interest of $7,622, taxes of $11,164, and depreciation of $49,904. Again, petitioners treated the loss as a nondeductible passive activity loss.

2011 Return and Carryback of Net Operating Loss to 2009 and 2010

On Form 4797, Sales of Business Property, of their 2011 return, petitioners reported a loss of $971,988 from their sale of the Gearhart property. That same

[*11] return reported income from the cancellation of indebtedness of $626,046, equal to the unpaid principal balance of the JPMorgan Chase loan. On Schedule E of their 2011 return, petitioners claimed a loss from their rental of the Gearhart property of $199,875, equal to the excess of the previously suspended passive losses over $1,574 of income from the property for 2011. As a result of the losses from the rental and sale of the Gearhart property, as well as other losses and deductions, petitioners reported a net operating loss (NOL) of $274,002 and applied for a refund of tax paid for 2009 and 2010 as a result of the carryback to those years of the 2011 NOL.

Petitioners filed amended returns for 2009 and 2010 reflecting the carryback of the 2011 NOL. Because the carryback of the 2011 NOL reduced petitioners' adjusted gross income for each of 2009 and 2010 below $150,000, their amended returns for those years claimed part of the losses from the rental of the Gearhart property ($25,000 for 2009 and $13,972 for 2010) that petitioners had treated as disallowed in their entirety under the passive activity loss rules of section 469. See sec. 469(i) (allowing for the deduction of up to $25,000 of losses from specified rental real estate activities, subject to phaseout for taxpayers with adjusted gross income between $100,000 and $150,000).

**[*12]** <u>2012</u>

The Form 1065, U.S. Return of Partnership Income, that Impact Medical initially filed for 2012 included a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., for Mr. Duffy that allocated to him guaranteed payments of $175,964[3] and an ordinary loss of $250,051. Petitioners' individual return for that year, filed on April 15, 2013, reported no self-employment tax. On Schedule E of that return, petitioners reported a nonpassive loss from Impact Medical of $74,087 (equal to the excess of the ordinary loss over the guaranteed payments reported on Mr. Duffy's Schedule K-1 from the partnership).

In addition to reporting a nonpassive loss from Impact Medical on their 2012 Schedule E, petitioners also reported a nonpassive loss of $11,690, identified as "UPE". The return provides no further description of that amount.

In September 2014, Impact Medical filed an amended return for 2012 that allocated all of its ordinary loss ($390,705) for that year to Dr. Edelson. The Schedule K-1 for Mr. Duffy included in the partnership's amended return for 2012 reports no losses, nondeductible expenditures, or distributions.

---

[3]Guaranteed payments are payments made by a partnership to a partner for capital or services in amounts determined without regard to partnership income. <u>See</u> sec. 707(c).

**[*13]** <u>2013</u>

The Schedule K-1 for Mr. Duffy included with Impact Medical's 2013 partnership return allocates to him an ordinary loss of $328,168, guaranteed payments of $218,182, a section 1231 loss of $2, and nondeductible expenses of $889. Mr. Duffy's Schedule K-1 also reports his share of partnership liabilities at the end of 2013 as $75,613 ($18,922 nonrecourse and $56,691 recourse). It also includes an analysis of Mr. Duffy's capital account in the partnership, determined using tax basis amounts, that gives an ending balance of $45,874.

Schedule E of petitioners' 2013 return reports a nonpassive loss from Impact Medical of $109,986 (again, equal to the excess of the ordinary loss over the guaranteed payments reported on Mr. Duffy's Schedule K-1 for the year). That Schedule E also reports a nonpassive loss of $10,397 labeled UPE. Although the UPE loss is, again, not further identified, a statement accompanying petitioners' 2013 return that lists current year partnership losses includes two items that sum to $10,397: $6,267 of home office expenses and $4,130 of unreimbursed expenses.

Petitioners' 2013 return reports other income of $1,000. An accompanying statement describes that amount as the net of three items: "cancellation of debt" of $391,532, "cancellation of debt--principal residence exclusion" of −$391,532, and $1,000 labeled only "JP Morgan". The return reports no self-employment tax.

**[*14]** <u>2014</u>

On the Schedule K-1 for Mr. Duffy included in Impact Medical's 2014 return, the partnership allocated to him an ordinary loss of $123,936, guaranteed payments of $25,082, interest income of $2, and nondeductible expenses of $239,402. Mr. Duffy's Schedule K-1 also states his share of partnership liabilities at the end of 2014 as $413,243 ($170,020 nonrecourse and $243,223 recourse).

Petitioners' 2014 individual return reports adjusted gross income of –$115,091, itemized deductions of $45,066, and exemptions of $23,700. The return includes an election under section 172(b)(3) to waive the carryback of the net operating loss it reports. Petitioners' 2014 return, like the ones they filed for 2012 and 2013, reports no self-employment tax.

Schedule E of petitioners' 2014 return reports a nonpassive loss from Impact Medical of $98,854 (again equal to the excess of the ordinary loss the partnership allocated to Mr. Duffy for the year over his guaranteed payments). That Schedule E also reports a $15,399 nonpassive loss identified as UPE without further identification.[4]

---

[4]Petitioners provided no substantiation of the nonpassive losses reported on Schedules E of their returns for 2012, 2013, and 2014 identified as UPE.

[*15] Return Preparers

Petitioners relied on accountants to prepare their individual returns for 2009 through 2014 and Impact Medical's partnership returns for 2012 through 2014. Ronald Stefani prepared the returns for 2009 through 2013, and Edwin O'Hanlin prepared the returns for 2014.

The Notice of Deficiency

Respondent disallowed the loss deductions petitioners claimed from the rental and sale of the Gearhart property on the grounds that the property was a personal residence. He also increased petitioners' cancellation of indebtedness income for 2011 by $108,661, equal to the unpaid interest on the JPMorgan Chase loan that had accrued upon its cancellation. Because those adjustments eliminated petitioners' reported NOL for 2011, respondent also disallowed the carryback of that NOL to 2009 and 2010.

Respondent determined that petitioners were not entitled to exclude from their taxable income the cancellation of $391,532 of indebtedness owed to Wells Fargo. He also determined that petitioners were not entitled to deduct the partnership losses reported on their Schedules E. In regard to the losses from Impact Medical, the notice of deficiency explains that petitioners "did not establish that * * * [Mr. Duffy] had sufficient partnership basis to claim" them.

[*16] Respondent disallowed petitioners' deduction of the losses labeled UPE because they "did not establish that the partnership agreement requires the partners to pay partnership expenses."[5] And respondent determined that Mr. Duffy was liable for self-employment tax for each year on his guaranteed payments from Impact Medical for the year.

The adjustments underlying the deficiency respondent determined for petitioners' 2014 taxable year (primarily, the disallowance of the deduction of Mr. Duffy's ordinary loss from Impact Medical and the loss labeled UPE) sum to $137,727. By contrast, the notice of deficiency states "Taxable Income Per Return or as Previously Adjusted" for 2014 as −$183,857 (the adjusted gross income shown on petitioners' 2014 return (−$115,091) reduced by itemized deductions of $45,066 and exemptions of $23,700). Thus, respondent determined that petitioners' "Corrected Taxable Income" for 2014 was −$46,130 (−$183,857 + $137,727). Even after respondent's adjustments, therefore, petitioners owe no regular income tax liability for 2014. The deficiency respondent determined for that year is attributable to self-employment tax on Mr. Duffy's guaranteed

---

[5]Respondent's disallowance of petitioners' deduction of the UPE losses reflects his understanding that those losses consist of expenses of Impact Medical paid by Mr. Duffy without reimbursement from the partnership. See infra part VI.

**[\*17]** payments from Impact Medical, net of a $2,000 child tax credit respondent would allow.

Finally, the notice of deficiency determined that petitioners were liable for an accuracy-related penalty for each year in issue as a result of either a substantial understatement of income tax or negligence.

Approval of Penalties

On December 16, 2015, Patricia Crespi signed a civil penalty approval form that authorized the assertion of accuracy-related penalties for petitioners' taxable years 2011 through 2014 on the grounds of substantial understatement of income tax and negligence.  The form shows Leah Kelly as "Examiner".  The parties stipulated that Ms. Crespi, a supervisory internal revenue agent (also known as an exam group manager), "was the manager or supervisor of one or more of the auditing revenue agents".

Stipulation of Settled Issues

In a stipulation of settled issues, the parties stipulated:  "Guaranteed payments made by Impact Medical LLC to petitioner Edward Duffy during taxable years 2012, 2013, and 2014 * * * are subject to income and self-employment taxes."

[*18]                              OPINION

I.      Loss on Sale of Gearhart Property

Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Losses of individual taxpayers, however, are deductible only if they were incurred in a trade or business or transaction entered into for profit or arising from a casualty or theft. Sec. 165(c).

Although losses from sales of personal residences are generally nondeductible under section 165(c), section 1.165-9(b)(1), Income Tax Regs., provides: "If property purchased or constructed by the taxpayer for use as his personal residence is, prior to its sale, rented or otherwise appropriated to income-producing purposes and is used for such purposes up to the time of its sale, a loss sustained on the sale of the property shall be allowed as a deduction". In general, the allowable loss is the excess of the property's adjusted basis over the amount realized from the sale. Sec. 1.165-9(b)(2), Income Tax Regs. For that purpose, however, the property's adjusted basis upon conversion cannot exceed its fair market value at that time. Id. The basis would be further reduced by any depreciation allowed between the conversion of the property and its sale. See sec. 1016(a)(2); secs. 1.167(g)-1, 1.1011-1, Income Tax Regs.

**[\*19]** Respondent argues that "petitioners failed to present any evidence that they held and/or operated the Gearhart beach house as a business asset or an investment asset." He observes that, while petitioners' tax returns for 2009 through 2011 claimed deductions for depreciation in respect of the Gearhart property, they did not claim deductions for other expenses that respondent views as "customary with respect to rental activities operated as a trade or business" such as "advertising, commissions, insurance, utilities, repairs, and/or supplies expenses". He also notes that "the trial record does not contain * * * documentation" of rentals of the Gearhart property.

In her opening brief, Mrs. Duffy claims that petitioners "effectively changed the use of the * * * [Gearhart] property in 2009" and that, as a consequence, their loss on the sale of that property was a "Section 1231 loss".[6] Thus, she implicitly claims that, when she and her husband sold the Gearhart property, they had used it in a trade or business. See sec. 1231(a)(3).

Respondent overstates his case when he claims that petitioners presented no evidence that they used the Gearhart property as a business asset. Respondent

_____

[6]Mrs. Duffy filed an opening brief on her own behalf because her attorney did not also represent her husband. She did not file an answering brief. Mr. Duffy filed no briefs at all.

**[\*20]** would have us ignore Mrs. Duffy's testimony concerning petitioners' rental of the Gearhart property to family and acquaintances.[7]

We need not decide whether petitioners' occasional rentals of the Gearhart property to family and acquaintances are sufficient to establish a trade or business. Even if we were to accept that petitioners converted the property to use in a rental business in 2009, we would still sustain respondent's disallowance of the loss deduction they claimed from their sale of the property because they have not established that the adjusted basis of the property at the time of sale exceeded the amount realized on the sale. If the Gearhart property were worth less than its cost when petitioners converted it to rental use, their basis in the property would have been reduced to its value. See sec. 1.165-9(b)(2), Income Tax Regs. The basis would have been further reduced by the depreciation petitioners claimed in respect of the property. Petitioners would thus have incurred a loss on their sale of the property only if its date-of-conversion value (less depreciation) exceeded the amount realized. See sec. 1001(a). The record includes no evidence, however, concerning the value of the Gearhart property when petitioners began renting it

---

[7]Respondent emphasizes the characterization of the Gearhart property as a second residence in the documentation prepared in connection with the JPMorgan Chase loan. Because petitioners obtained that loan in September 2008, the characterization of the property at that time is not inconsistent with Mrs. Duffy's claim that she and her husband began renting the property in 2009.

[*21] out in 2009.  Because petitioners have not established that the adjusted basis of the Gearhart property upon its sale exceeded the amount realized, respondent properly disallowed the loss deduction petitioners reported from the sale.

II.    Income From Cancellation of JPMorgan Chase Loan

Section 61(a) defines gross income to mean "all income from whatever source derived".  That section goes on to list items specifically included in gross income, including "[i]ncome from discharge of indebtedness".  Sec. 61(a)(12).  Section 108(a)(1)(B), however, excludes from a taxpayer's gross income amounts otherwise includible as a result of the discharge of indebtedness if "the discharge occurs when the taxpayer is insolvent".[8]  In addition, section 108(e)(2) provides: "No income shall be realized from the discharge of indebtedness to the extent that payment of the liability would have given rise to a deduction."

When a creditor forgives debt in connection with the sale or exchange of property that secures the debt, the discharge of debt can either result in cancellation of indebtedness income or instead be included in the taxpayer's amount realized from the sale, thereby increasing the taxpayer's gain or reducing the taxpayer's loss on the sale.  The varying treatment of the debt discharge turns

_____

[8]The sec. 108(a)(1)(B) exclusion is limited to "the amount by which the taxpayer is insolvent."  See sec. 108(a)(3).

**[\*22]** on whether the indebtedness was recourse or nonrecourse--that is, whether the creditor's remedies were limited to the transferred property. Section 1.1001-2(a)(1), Income Tax Regs., provides as a general rule that "the amount realized from a sale or other disposition of property includes the amount of liabilities from which the transferor is discharged as a result of the sale or disposition." Section 1.1001-2(a)(2), Income Tax Regs., however, provides: "The amount realized on a sale or other disposition of property that secures a recourse liability does not include amounts that are (or would be if realized and recognized) income from the discharge of indebtedness under section 61(a)(12)."

In her brief, Mrs. Duffy disavows the position she and her husband took on their 2011 return and claims that the cancellation of indebtedness income they realized in 2011 "is not taxable" to them "as a result of their insolvency". Respondent has conceded that petitioners did not realize income from the cancellation of $32,572 of unpaid interest on the JPMorgan Chase loan because their payment of that portion of the interest would have been deductible. But respondent maintains that petitioners realized unreported cancellation of indebtedness income of $76,089 ($108,661 total unpaid interest subtracting $32,572 deductible portion).

[*23] Respondent's position reflects his determination that the JPMorgan Chase loan was a recourse liability of petitioners because the lender, had it chosen to do so, could have proceeded against petitioners for the unpaid balance of the loan after application of $750,841 of the proceeds from the sale of the Gearhart property. Respondent acknowledges that, if the JPMorgan Chase loan were instead nonrecourse--in that the bank's remedies were limited to the Gearhart property--the unpaid loan would have been included in petitioners' amount realized from the sale of the property. See sec. 1.1001-2(a), Income Tax Regs. In that event, respondent accepts that the canceled loan would have reduced petitioners' nondeductible loss without resulting in cancellation of indebtedness income.[9] (Even if the unpaid loan were included in petitioners' amount realized from the sale of the property, it is unlikely petitioners would have realized a gain on the sale. The adjusted basis of a personal residence converted to business use is stepped down to fair market value for purposes of determining a loss on a subsequent sale of the property but not for purposes of determining gain on such sale. See Simonsen v. Commissioner, 150 T.C. 201, 214 (2018).)

---

[9]Respondent makes no argument that the discharge of part of the JPMorgan Chase loan was not "a result of" petitioners' sale of the Gearhart property. See Simonsen v. Commissioner, 150 T.C. 201, 209-211 (2018).

**[*24]** Before considering petitioners' claimed entitlement to the insolvency exclusion of section 108(a)(1)(B), we must first address the scope of JPMorgan Chase's remedies--in particular, whether the loan secured by the Gearhart property was recourse or nonrecourse. Resolution of that question requires an interpretation of Oregon's "antideficiency" statute.

Under Oregon law, when property subject to an obligation secured by a trust deed is foreclosed upon, the lender's ability to bring a deficiency action against the debtor to obtain repayment of any portion of the obligation not satisfied by the proceeds of the foreclosure sale turns on the nature of both the property and the foreclosure proceedings. See Or. Rev. Stat. sec. 86.770(2) (2011). The statute bars deficiency actions after a judicial foreclosure of a residential trust deed and after an administrative foreclosure on any type of property. Id. Respondent contends that the JPMorgan Chase loan "was a recourse liability under Oregon law because the property was not subject to a residential trust deed". If petitioners sold the Gearhart property in an administrative foreclosure, however, without the involvement of a court, the Oregon antideficiency statute limited JPMorgan Chase's remedies regardless of whether the trust deed securing that loan was a "[r]esidential trust deed" within the meaning of Or. Rev. Stat. sec. 86.705(5) (2011).

[*25] Because the documents which the parties stipulated regarding petitioners' sale of the Gearhart property do not include any judicial filings by JPMorgan Chase and we find no reference to any judicial proceedings in the documents that were stipulated, we infer that the sale was part of an administrative rather than a judicial foreclosure. Therefore, Oregon's antideficiency statute prevented JPMorgan Chase from seeking satisfaction from petitioners' other assets of that part of its loan in excess of the proceeds it received from the sale of the Gearhart property. Petitioners' amount realized from the sale of the Gearhart property is thus determined under the general rule of section 1.1001-2(a)(1), Income Tax Regs., rather than the exception for the cancellation of recourse liabilities provided in section 1.1001-2(a)(2), Income Tax Regs. It follows that the amount of the JPMorgan Chase loan from which petitioners were discharged is included in their amount realized from their sale of the Gearhart property. Petitioners thus realized no section 61(a)(12) discharge of indebtedness income from the cancellation of the $626,046 principal amount of the JPMorgan Chase loan or $108,661 of accrued but unpaid interest. We need not address the issue of petitioners' insolvency at the time of discharge.

**[*26]** III.    Losses From Rental of Gearhart Property

Understanding petitioners' reporting of their rental of the Gearhart property requires an understanding of the passive activity loss rules of section 469. Congress enacted that section in 1986 as part of its efforts to deter tax shelter investments it viewed as abusive.  Section 469 prohibits specified taxpayers, including individuals, from deducting losses from passive activities against other income.  In general, passive activities are trade or business activities in which the investor does not materially participate.  See sec. 469(c)(1).  Rental activities are generally considered passive activities regardless of the extent of the investor's participation.  See sec. 469(c)(2).  Nonetheless, an individual who actively participates in the rental of real estate can deduct up to $25,000 of annual losses from the activity.  Sec. 469(i)(1) and (2).  The exclusion provided by section 469(i) is phased out for a taxpayer whose adjusted gross income exceeds $100,000 and is eliminated entirely if the taxpayer's adjusted gross income exceeds $150,000.  See sec. 469(i)(3)(A).  Losses disallowed under the passive activity loss rules can be carried forward and used to offset income from passive activities or when the taxpayer, in a taxable transaction, disposes of his interest in the activity that generated the loss.  See sec. 469(b), (g)(1)(A).

[*27] Because the return petitioners initially filed for each of 2009 and 2010 reported adjusted gross income exceeding $250,000, they were not eligible, on the basis of those returns, for the section 469(i) exemption from the general passive loss disallowance rule. Presumably for that reason, they reported their loss as unallowable. But their sale of the Gearhart property in 2011 gave them reason under section 469(g)(1)(A) to report the previously suspended losses on their return for that year.

Petitioners' 2011 return also reflects the rules for NOLs provided in section 172. Under that section, when an individual taxpayer incurs a net loss for a year from business activities, the loss is carried back to offset income of the taxpayer for the two prior years. See generally sec. 172. Any NOL remaining after carryback is then carried forward to offset the taxpayer's income in future years. Sec. 172(b)(1)(A)(ii). Section 172(b)(3) allows the taxpayer to waive the carryback and simply carry the NOL forward.

Because petitioners' carryback of the 2011 NOL under section 172 reduced their adjusted gross income for each of 2009 and 2010 below $150,000, their amended returns for those years claimed loss deductions from the rental of the Gearhart property under section 469(i) of $25,000 and $13,972, respectively. (Petitioners did not adjust the rental loss they claimed for 2011 to reflect the

[*28] deduction on their amended returns for 2009 and 2010 of part of the previously suspended losses for those years.)

Respondent apparently bases his disallowance of the loss deductions petitioners claimed from the rental of the Gearhart property on section 280A(a), which provides as a general rule that no deduction is allowed to individuals or specified corporations "with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence." (Respondent appears not to have considered the special rules that apply to the rental of dwelling units. Among other things, those rules allow the deduction of amounts, such as mortgage interest and property taxes, that would be deductible without regard to the rental use of the property. See sec. 280A(c)(3), (5), (e).)

Because their petition did not assign error to respondent's disallowance of the loss deductions they claimed from the rental of the Gearhart property, we would normally treat petitioners as having conceded the issue. A taxpayer's petition to this Court must include "[c]lear and concise assignments of each and every error which the * * * [taxpayer] alleges to have been committed by the Commissioner in the determination of the deficiency or liability." Rule 34(b)(4). If the taxpayer fails to raise an issue in his assignments of error, that issue is "deemed to be conceded." Id.

[*29] If an issue omitted from the parties' pleadings is tried by their express or implied consent, however, we will treat the issue as having been raised in the pleadings. Rule 41(b)(1). In the present case, respondent arguably consented to try the issue of the deductibility of petitioners' losses from the rental of the Gearhart property despite their failure to assign error to his disallowance of those loss deductions. Respondent addressed the deductibility of those loss deductions in the list of issues provided in his pretrial memorandum and his opening brief. In each case, respondent did not identify the deductibility of the rental losses as a separate issue but claimed that the disallowance of those loss deductions followed from the disallowance of the deductions petitioners claimed from the rental of the Gearhart property. In addition, respondent's opening brief advances the argument petitioners were not entitled to deduct the reported rental losses because they used the Gearhart property as a residence. See sec. 280A.

Even if we were to treat the issue of the deductibility of petitioners' reported losses from their rental of the Gearhart property as having been tried by consent, and thus raised in the pleadings, we would still conclude that petitioners have conceded the issue. An issue raised by the pleadings may be conceded if a party fails to advance on brief an argument regarding that issue. E.g., Bradley v. Commissioner, 100 T.C. 367, 370 (1993); Ashkouri v. Commissioner, T.C. Memo.

[*30] 2019-95, at *24. Mrs. Duffy's brief neither included the deductibility of the rental losses in her list of issues before the Court nor advanced any argument in support of their deductibility. Because of their repeated failures to raise the issue, we will treat petitioners as having conceded that they are not entitled to deduct the losses they reported for 2009, 2010, and 2011 from their rental of the Gearhart property.

IV.  Cancellation of Wells Fargo Indebtedness

On brief, Mrs. Duffy admits that "[t]he debt discharged by Wells Fargo Bank did not qualify as an exclusion from taxable income under Internal Revenue Code Section 108(a)(1)(E)". That section excludes from income the discharge before January 1, 2014, of "qualified principal residence indebtedness". Indebtedness qualifies for the section 108(a)(1)(E) exclusion only if it was incurred to acquire, construct, or improve a taxpayer's principal residence. See secs. 108(h)(2), 163(h)(3)(B). Mrs. Duffy admits that the proceeds of the Wells Fargo loan were "used for supporting * * * [her] family, rather than improving the property" that secured the loan. But, she contends, "the discharge of the [Wells Fargo] debt was not reported as taxable income on the Form 1040 for 2013 . . . for the wrong reason!" She now avers that she and her husband "were insolvent when that debt was forgiven." According to Mrs. Duffy: "The assets owned by the

[*31] Petitioners in October of 2013 would have been their * * * Portland residence for the value of $750,000 and * * * [Mr. Duffy's] interest in Impact Medical", which she claims "was worth at best less than $120,000." She adds: "The Petitioners['] debts consisted of the debt to Oswego Bank of approximately $200,000, the underlying mortgage on the * * * [Portland] residence * * * $65,000 of credit card debt; the line of credit debt forgiven by Wells Fargo Bank of $391,532; as well as debts still owing on vehicles."

Respondent contends that petitioners have failed to meet their burden of proving that they were insolvent immediately before the discharge of the Wells Fargo loan. Respondent acknowledges petitioners' testimony regarding their insolvency but dismisses that testimony as "vague and conclusory." Respondent suggests that petitioners' claim of insolvency is undermined by evidence of their lifestyle, such as their enrollment of their children in private schools that they supported with donations and Mr. Duffy's membership in a country club. Respondent also invokes the homeowners' insurance policy on the Portland residence that covered personal property "valued at over $130,000.00". And respondent argues that Mr. Duffy's testimony concerning the substantial contributions he made to Impact Medical between 2011 and 2014 renders "inconsistent and incredulous" petitioners' claim of insolvency. Finally,

**[*32]** respondent suggests that our caselaw establishes that taxpayers' testimony cannot meet their burden of establishing insolvency when that testimony is unsupported by documentary evidence.

We agree with respondent's characterization of Mr. Duffy's testimony. We also agree that Mrs. Duffy's testimony was not as specific as it might have been. Nonetheless, her testimony convinces us that petitioners were insolvent immediately before the discharge of the Wells Fargo loan to an extent that, under section 108(a)(1)(B) and (3), they are entitled to exclude from their gross income some, but not all, of the amount that would otherwise be includible under section 61(a)(12).

The record establishes that, between them, petitioners owned, on October 28, 2013, the Portland residence, Mr. Duffy's interest in Impact Medical, two automobiles, and other personal property such as jewelry, fine art, and silverware. Mrs. Duffy testified that the Portland residence was worth "[p]robably around 750,000" when the Wells Fargo debt was canceled in October 2013, and respondent offered no evidence to contradict her assessment.[10]

_____

[10]We reject respondent's suggestion that a taxpayer can establish insolvency only by documentary evidence and that the taxpayer's testimony alone is insufficient. Indeed, in Newman v. Commissioner, T.C. Memo. 2016-125, at *7, one of the cases respondent cites in support of his position, we accepted that the

(continued...)

**[*33]** We also agree with Mrs. Duffy's claim on brief that her husband's interest in Impact Medical "was worth at best less than $120,000." The $45,874 balance in Mr. Duffy's capital account at the end of the year, as reported by the partnership, indicates that, had the partnership then liquidated, in the absence of unrealized appreciation in its assets, Mr. Duffy would have received no more than $45,874. See sec. 1.704-1(b)(2)(ii)(b)(2), Income Tax Regs. (requiring that liquidating distributions "be made in accordance with the positive capital account balances of the partners"); see also sec. 1.704-1(b)(2)(iv)(f)(5)(ii), Income Tax Regs. (allowing for adjustment of capital accounts to reflect a revaluation of partnership property "[i]n connection with the liquidation of the partnership"). Given the substantial losses Impact Medical had reported since its inception, we view it as unlikely that the partnership had significant unrealized appreciation in its assets. Consequently, we accept Mr. Duffy's capital account balance as of December 31, 2013, as a reasonable proxy for the value of his interest in the partnership as of October 28, 2013.

While the record establishes that the Portland residence and Mr. Duffy's interest in Impact Medical were the most valuable assets petitioners owned on

---

[10](...continued)
taxpayer had met his burden of establishing his insolvency by "provid[ing] credible testimony that his assets and liabilities were what he claimed they were."

**[*34]** October 28, 2013, Mrs. Duffy's claim that those two properties were their only assets obviously overstates the case. To begin with, her list of debts includes "debts still owing on vehicles". We take that as an indication that, in October 2013, she and her husband still owned the Chevy Suburban and Jeep Commander they had owned in March 2011 when they sold the Gearhart property and part of the JPMorgan Chase loan was canceled. Although Mrs. Duffy testified to the value of those vehicles in March 2011, petitioners presented no evidence of their value in October 2013 when the Wells Fargo debt was forgiven. Nonetheless, we assume that the vehicles did not increase in value between March 2011 and October 2013.

When respondent dismisses "petitioners' insolvency claims * * * [as] inconsistent and disingenuous when considered with some of the documents in the record", he refers, among other things, to the list of personal property covered by their homeowners' insurance policy. But Mrs. Duffy testified that, by October 2013, she had lost some of the items of jewelry on the list and sold the rest to raise money after her husband lost his job. She explained why she had not been scrupulous in keeping the itemized list up to date. According to Mrs. Duffy's testimony, the only item of jewelry she continued to own in October 2013 was the wedding ring that replaced the one she had lost. Given petitioners' financial

[*35] circumstances, we think it reasonable to assume that they did not spend more on the new ring than the value of the ring it replaced. Therefore, we find that the jewelry, fine art, and silverware petitioners owned on October 28, 2013, had a fair market value of $27,003 (wedding ring worth $16,000, fine art worth $1,140, and silverware worth $9,863).

Finally, although petitioners presumably had some liquid assets on October 28, 2013, we conclude that the value of those assets was insignificant. In particular, we accept Mr. Duffy's testimony concerning the liquidation of his retirement savings account and his use of the proceeds.

In short, we find, on the basis of the record before us that, immediately before the discharge of the Wells Fargo debt, petitioners owned assets with fair market value of $884,877: the Portland residence, worth $750,000; Mr. Duffy's interest in Impact Medical, worth $45,874; automobiles worth $62,000 ($48,000 + $14,000), and other personal property worth $27,003.

We also conclude that, immediately before the discharge of the Wells Fargo debt, petitioners owed liabilities of $1,159,281. In her brief, Mrs. Duffy refers to the largest of those liabilities, the mortgage on the Portland residence, but does not provide the balance of the mortgage on October 28, 2013. She merely advises us that the mortgage on the Portland residence is "referenced in" the application she

[*36] and her husband submitted to JPMorgan Chase for the $1.4 million loan on the Gearhart property. That application, which is dated September 15, 2008, includes the mortgage on the Portland residence in a list of petitioners' then-existing liabilities and gives its unpaid balance, at that time, as $470,749. Mrs. Duffy also claims in her brief that, in October 2013, she and her husband "still ow[ed] * * * debts on [their] vehicles".

Petitioners have not presented specific evidence concerning the balances, as of October 28, 2013, of their vehicle loans or the mortgage on the Portland residence. But the record as a whole supports the inference that the balance of petitioners' mortgage on the Portland residence did not change materially between September 2008 and October 2013 and that they were unable to materially reduce the balance of their car loans between March 2011 and October 2013. Similarly, we accept Mrs. Duffy's testimony that, between 2011 and 2013, she and her husband were unable to reduce the balances of their credit card debt or the Oswego Bank home equity line of credit. We find that unsurprising given Mr. Duffy's loss of employment.

Therefore, as noted above, we find that, immediately before the discharge of the Wells Fargo debt, petitioners owed liabilities of $1,159,281: a mortgage on the Portland residence of $470,749, the Wells Fargo home equity line of credit of

[*37] $391,532, the Oswego Bank home equity loan of $200,000, credit card debt of $65,000, and auto loans of $32,000 ($22,000 + $10,000). Those liabilities exceeded the fair market value of petitioners' assets, at that time, by $274,404 ($1,159,281 – $884,877). Because petitioners were insolvent, immediately before the discharge of the Wells Fargo debt, by $274,404, the amount of their gross income from the cancellation of the Wells Fargo debt is limited to $117,128 ($391,532 – $274,404). See sec. 108(a)(1)(B), (3).[11]

V.   Deductibility of Impact Medical Losses

A partner can deduct his share of a partnership's loss for a taxable year only to the extent of the adjusted basis of his partnership interest at the end of the year. Sec. 704(d). (The partner's basis in his partnership interest is often referred to as his "outside" basis, to distinguish it from the partnership's "inside" basis in its assets.) Any excess of the loss allocated to the partner over his outside basis carries forward to the following year. Id.

---

[11]We do not find the evidence respondent cites concerning petitioners' lifestyle probative on the question of their insolvency. They may have largely maintained their prior lifestyle for a time after Mr. Duffy's loss of employment in the hope that Impact Medical would prove successful. But the evidence shows that Mr. Duffy's investments in the partnership did not bear fruit. Any failure by petitioners to adjust their living expenses to their changed financial circumstances may have contributed to their insolvency.

[*38] When a partner acquires his interest in a partnership by contributing property to the partnership, the partner's initial outside basis equals the amount of any money and the adjusted basis of any other property contributed.  Sec. 722.  (If the partner recognizes gain on the exchange, his initial outside basis is increased by the amount of that gain.  Id.)  The partner's initial outside basis is adjusted over time to reflect partnership activity.  In particular, his outside basis is increased by his share of partnership income and decreased by distributions made by the partnership to the partner and by the partner's share of partnership losses and nondeductible expenditures.  See secs. 705, 733.  A partner's outside basis also includes the partner's share of partnership liabilities.  Section 752 achieves that result by treating increases in the partner's share of partnership liabilities as cash contributions and decreases as cash distributions.

On brief, respondent acknowledges that Mr. Duffy made capital contributions to Impact Medical of $50,000 and $450,000.  He does not explain why, even leaving aside Mr. Duffy's share of the partnership's liabilities,[12] those contributions did not provide Mr. Duffy sufficient outside basis to deduct at least

_____

[12]Respondent suggests that "a partner's outside basis is increased only when the partnership's liabilities are recourse".  That suggestion, however, is plainly incorrect.  See sec. 1.752-1(a)(4), Income Tax Regs. (defining "liability" for purposes of sec. 752 without distinction between recourse and nonrecourse obligations).

[*39] some of the ordinary losses the partnership allocated to him. Moreover, in the course of his argument, he gets confused about the dates of the contributions. Initially, he describes the $50,000 and $450,000 contributions as having been made in December 2012 and January 2013, respectively. That description is consistent with the parties' stipulations. Later in his brief, however, respondent repeatedly describes the two contributions as having been made one year later, in December 2013 and January 2014. Despite his confusion about when Mr. Duffy made his capital contributions, respondent accepts that Mr. Duffy contributed substantial capital to Impact Medical between 2012 and 2014. Nonetheless, respondent concludes: "[P]etitioners have not established that petitioner Edward Duffy had sufficient outside basis in Impact Medical LLC to take the reported flow-through ordinary losses for taxable years 2012, 2013, and 2014."

Mrs. Duffy, by contrast, asserts in her brief that her husband "had basis in Impact Medical for the years 2012, 2013, and 2014, as a result of capital contributions he made in those years." In particular, she contends, her husband "had capital contributions into Impact Medical in 2012 of $125,000, in 2013 capital contributions of $590,000 and in 2014 of $180,000." She fails, however, to cite evidence in the record in support of that contention.

**[\*40]** For the reasons explained below, we conclude that petitioners are not entitled to deduct any ordinary loss from Impact Medical for 2012 but are entitled to deduct the loss the partnership allocated to Mr. Duffy for 2013. As explained infra part V.C., we need not decide whether Mr. Duffy had sufficient outside basis in Impact Medical to allow him to deduct the entire ordinary loss the partnership allocated to him for 2014. Even after the adjustments reflected in the notice of deficiency for 2014, petitioners had no taxable income. The deductibility of Mr. Duffy's loss from Impact Medical for 2014 is relevant to the case--if at all--only because of its possible effect on Mr. Duffy's self-employment tax liability. We conclude that, whatever Mr. Duffy's outside basis in Impact Medical at the end of 2014, it was sufficient to allow him to deduct a loss that would eliminate his net earnings from self-employment.

A. 2012

We need not address the question of Mr. Duffy's outside basis in Impact Medical at the end of 2012 because petitioners have not established that the partnership allocated any loss to Mr. Duffy for that year. The return the partnership originally filed for that year did allocate to Mr. Duffy an ordinary loss of $250,051, equal to the amount petitioners took into account in computing the nonpassive loss from the partnership that they reported on their return. But the

**[\*41]** partnership's amended return allocated to Dr. Edelson all of the partnership's $390,705 ordinary loss for the year.

Section 6222 requires a partner to report partnership items on an individual return in a manner consistent with the partnership's reporting. If the partner reports inconsistently and fails to notify the Commissioner of the inconsistency, section 6222(c) authorizes the Commissioner to make a computational adjustment to conform the partner's treatment of the relevant items to the partnership's treatment of those items and collect any additional tax without deficiency procedures.

We assume that section 6222 would not apply to petitioners' 2012 taxable year (regardless of whether Impact Medical is covered by the small partnership exception[13]) because petitioners' reporting of Mr. Duffy's partnership items from Impact Medical was consistent with the return the partnership initially filed and the partnership did not file its amended return until after petitioners had filed their individual return for the year. The fact that respondent cannot disallow the ordinary loss petitioners claimed from Impact Medical for 2012 by means of a computational adjustment, however, does not mean that petitioners are entitled to the reported loss.

---

[13]See infra note 15.

[*42] Petitioners ignore the partnership's amended return.[14]  Implicitly, they ask us to accept that the return the partnership originally filed was correct and the amended return incorrect.  But they advance no argument in support of that treatment.  Because petitioners' claim of an ordinary loss from Impact Medical for 2012 is inconsistent with the partnership's amended return for the year, they have not met their burden of proving their entitlement to deduct any loss, without regard to the adequacy of Mr. Duffy's outside basis to absorb a loss.

B.    2013

The record shows that Mr. Duffy's outside basis in Impact Medical at the end of 2013 was sufficient that his entitlement to deduct the $328,168 loss the partnership allocated to him for that year was not limited by section 704(d).  As noted above, respondent accepts that Mr. Duffy made capital contributions to the partnership totaling $500,000 no later than January 2013.  The Schedule K-1 for Mr. Duffy included in the partnership's amended return for 2012 reports no losses, nondeductible expenditures, or distributions that would have reduced Mr. Duffy's outside basis.  The Schedule K-1 for Mr. Duffy included with the partnership's

---

[14]Respondent largely ignores the partnership's amended return as well.  He acknowledges the amended return in a footnote to his opening brief but does not consider the effect of that return on his position that petitioners are not entitled to deduct an ordinary loss from Impact Medical for 2012.

**[\*43]** 2013 return reports the allocation to him of a $2 section 1231 loss and nondeductible expenditures of $889. That Schedule K-1 also reports that Mr. Duffy's share of partnership liabilities at the end of the year was $75,613 ($18,922 nonrecourse and $56,691 recourse). We do not understand respondent to question the partnership's reporting.[15] It follows that Mr. Duffy's outside basis at the end of 2013, before taking into account the ordinary loss the partnership allocated to him, was at least $574,722 ($500,000 – $2 – $889 + $75,613). Section 704(d) thus did not limit Mr. Duffy's ability to deduct the $328,168 ordinary loss that the partnership allocated to him for 2013.

### C. 2014

As noted above, the deductibility of the ordinary loss Impact Medical allocated to Mr. Duffy for 2014 is not relevant to petitioners' income tax liability for the year. Petitioners owe no income tax for the year regardless of whether Mr. Duffy is entitled to deduct any portion of the partnership loss.

---

[15]Whether respondent could challenge the partnership's reporting in this partner-level proceeding depends on whether Impact Medical qualified for the small partnership exception from the unified partnership audit and litigation rules enacted by the Tax Equity and Fiscal Responsibility Act of 1982 and in effect before 2018. See sec. 6231(a)(1)(B)(i). Because Impact Medical had only two partners during the years in issue, both of whom were individuals, the partnership would have been covered by the small partnership exception unless either Mr. Duffy or Dr. Edelson was a nonresident alien. Id.

**[*44]** Because petitioners' 2014 return includes an election under section 172(b)(3) to waive the carryback of the net operating loss reported on that return, the deductibility of Mr. Duffy's loss from Impact Medical is not relevant to their income tax liability for either 2012 or 2013. For income tax purposes, the deductibility of that loss is relevant only for 2015 and subsequent years--years that are not before us in this case.

The deficiency respondent determined for petitioners' 2014 taxable year is entirely attributable to self-employment tax on Mr. Duffy's guaranteed payments from the partnership of $25,082. As explained infra part VII, the deficiency respondent determined rests on the premise that Mr. Duffy's net earnings from self-employment for 2014 would be reduced by his distributive share of the partnership's ordinary loss for that year only to the extent that the loss is deductible in computing petitioners' 2014 taxable income. Even if that premise were correct, we would need to determine only that Mr. Duffy's outside basis in Impact Medical at the end of 2014 at least equaled the guaranteed payments of $25,082 that he received from the partnership in that year.

Whatever the precise amount of Mr. Duffy's outside basis in Impact Medical at the end of 2014, we can readily conclude that it was at least $25,082. The Schedule K-1 that the partnership issued to Mr. Duffy for 2014 allocated to him--

**[*45]** in addition to the ordinary loss of $123,936--nondeductible expenditures of $239,402 and $2 of interest income. That schedule also states his share of partnership liabilities at the end of 2014 as $413,243 ($170,020 nonrecourse and $243,223 recourse). His share of partnership liabilities thus increased during 2014 by $337,630 ($413,243 – $75,613). No other items shown on Mr. Duffy's 2014 Schedule K-1 would affect his outside basis. The items other than the ordinary loss increased his outside basis by $98,230 ($337,630 increase in allocated liabilities + $2 interest income – $239,402 nondeductible expenditures).

Because the items reported on Mr. Duffy's 2014 Schedule K-1 other than the ordinary loss increased his outside basis by more than $25,082, we need not decide the extent to which that basis was reduced, as of January 1, 2014, by reason of petitioners' exclusion under section 108(a)(1)(B) and (3), of part of the income they would otherwise have recognized from cancellation of the Wells Fargo indebtedness. The exclusion of cancellation of indebtedness income from a taxpayer's gross income under the insolvency exclusion is not always a permanent exclusion. As a concomitant of the exclusion, the taxpayer must apply the excluded income to reduce specified tax attributes, including the basis of property held by the taxpayer at the beginning of the year following the year of discharge, to the extent provided in sections 108(b) and 1017. The reduction of tax attributes

[*46] may require the taxpayer to recognize additional taxable income in the future. To that extent, the insolvency exclusion effects merely a deferral of tax rather than a permanent exemption.

Even if Mr. Duffy's outside basis in Impact Medical as of January 1, 2014, had been reduced to zero under sections 108(b)(2)(E) and 1017(a), he would have had a basis at the end of the year of $98,230 before taking into account his distributive share of the partnership's ordinary loss. We therefore conclude that, after applying the limitation imposed by section 704(d), petitioners were entitled to deduct an ordinary loss from Impact Medical for 2014 of at least $25,082.

VI. Unreimbursed Partnership Expenses

Respondent's opening brief includes a proposed finding of fact that the amounts identified as "UPE" on petitioners returns are unreimbursed partnership expenses. Because petitioners did not object to that proposed finding--or, indeed, any of respondent's proposed findings--and because we find nothing in the record that contradicts it, we will accept respondent's proposed finding that the nonpassive losses petitioners identified as UPE are unreimbursed partnership expenses.

When a partner pays expenses of a partnership, an issue can arise regarding the proportion of those expenses the paying partner is entitled to deduct. See, e.g.,

[*47] <u>Cropland Chem. Corp. v. Commissioner</u>, 75 T.C. 288, 294-297 (1980), <u>aff'd</u> <u>without published opinion</u>, 665 F.2d 1050 (7th Cir. 1981); <u>Klein v. Commissioner</u>, 25 T.C. 1045, 1051-1052 (1956); <u>McLauchlan v. Commissioner</u>, T.C. Memo. 2011-289, 2011 WL 6378793, at *2-*3, <u>aff'd and remanded</u>, 558 F. App'x 374 (5th Cir. 2014). A partner generally cannot deduct partnership expenses as such. But a partner's payment of partnership expenses can be treated as a contribution to the partnership, with the paying partner then entitled to deduct his allocable share of the expense. By express agreement or course of conduct, however, the entire expense can be specifically allocated to the partner who paid it.

In contesting respondent's disallowance of petitioners' claimed deduction of unreimbursed expenses of Impact Medical, Mrs. Duffy claims that, because her husband "was authorized, of necessity, to personally pay expenses * * * [t]o the extent they were not reimbursed, they should be deductible." Conversely, respondent argues that "petitioners have not established that there was a routine practice equal to an agreement between himself and Dr. Edelson that required petitioner Edward Duffy to use his or her [sic] own funds to pay a partnership expense."

The question of the share of a partnership expense allocable to a partner who paid the expense on behalf of the partnership does not arise unless the partner

[*48] substantiates the amount of the expense. In the present case, petitioners provided no substantiation of the nonpassive losses reported on Schedules E of their returns for 2012, 2013, and 2014 identified as UPE. Therefore, respondent properly disallowed those losses.

VII. Self-Employment Tax

Section 1401(a) imposes a tax "on the self-employment income of every individual". An individual's "net earnings from self-employment" are included in his self-employment income unless specifically excluded. Sec. 1402(b). Subject, again, to specified exceptions, section 1402(a) provides:

> The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which he is a member * * *

On brief, respondent appears to take the position that petitioners conceded in the stipulation of settled issues that Mr. Duffy had net earnings from self-employment for each of the years 2012 through 2014 equal to his guaranteed payments from the partnership for the year. Respondent thus reads the stipulation that Mr. Duffy's guaranteed payments "are subject to income and self-employment taxes" to reflect an agreement that petitioners must pay income tax on those

**[*49]** payments, and Mr. Duffy must pay self-employment tax on them. In other circumstances, we might agree with respondent's reading of the phrase "subject to". The circumstances of this case, however, make it clear that the stipulation that the guaranteed payments are subject to the specified taxes does not mean that those taxes must in all events be paid on the guaranteed payments. As noted supra part V, the notice of deficiency reflects respondent's determination that petitioners have no income tax liability for 2014. Therefore, petitioners do not have to pay income tax on the guaranteed payments Mr. Duffy received from Impact Medical in that year. We therefore read the parties' stipulation to mean only that Mr. Duffy's guaranteed payments must be taken into account in computing petitioners' taxable income and Mr. Duffy's net earnings from self-employment. The stipulation thus leaves open the possibility that Mr. Duffy's guaranteed payments may be offset by allowable deductions in determining the relevant tax base.

Respondent's determination that Mr. Duffy was liable for self-employment tax on the guaranteed payments he received from Impact Medical in 2013 and 2014 thus rests on the implicit premise that, as a matter of law, the ordinary loss the partnership allocated to Mr. Duffy for each of those years reduces Mr. Duffy's net earnings from self-employment only to the extent it was deductible for purposes of computing petitioners' "regular" tax liability under chapter 1 of

[*50] subtitle A of the Internal Revenue Code (sections 1 through 1400-U3) after applying the section 704(d) limitation.  Respondent does not address that legal issue in either of his briefs or acknowledge that the validity of his position turns on its resolution.[16]

Given the plain terms of section 1402(a) and its accompanying regulations, it is far from apparent that a partner's distributive share of an ordinary loss incurred by a partnership engaged in a trade or business reduces the partner's net earnings from self-employment only to the extent that the loss is allowed as a

---

[16]If Mr. Duffy could be viewed as a limited partner of Impact Medical, his ordinary losses from the partnership would be excluded from his net earnings from self-employment regardless of whether those losses were deductible under sec. 704(d).  See sec. 1402(a)(13).  In that case, the guaranteed payments he received would be included in his net earnings from self-employment without any offsetting deduction if those payments were for services Mr. Duffy rendered to the partnership.  See id.  Because Impact Medical was a limited liability company, however, Mr. Duffy was a member and not a limited partner.  Even so, he could be treated as a limited partner if his relationship to the entity was akin to that of a limited partner in a limited partnership.  See generally Renkemeyer, Campbell & Weaver, LLP v. Commissioner, 136 T.C. 137 (2011).  In Renkemeyer, Campbell & Weaver, LLP v. Commissioner, 136 T.C. at 147, however, we concluded that an owner's protection from claims against an entity is not enough to qualify the owner as a limited partner for purposes of sec. 1402(a)(13).  Instead, we concluded that an interest other than a limited partner interest could be treated as such for purposes of that section only if the holder is merely a passive investor in the entity who does not actively participate in the entity's business operations.  Id. at 150.  But Mr. Duffy served as Impact Medical's manager and, as such, was obliged to run the company's day-to-day operations.  Therefore, we see no grounds for treating him as a limited partner of Impact Medical within the meaning of sec. 1402(a)(13).

**[\*51]** deduction in computing the partner's regular taxable income. Under the plain terms of section 1402(a), income from a business an individual carries on directly can be reduced by deductions only to the extent that those deductions are "allowed by" subtitle A (sections 1 through 1563). But that limitation does not apply to the individual's distributive share of partnership income or loss. Under the statutory text, after allowable deductions are subtracted from the individual's income from any directly conducted business, the individual's net earnings from self-employment are increased or reduced by the individual's "distributive share * * * of income or loss * * * from any trade or business carried on by a partnership of which he is a member". The text of section 1402(a) gives no indication that the individual's distributive share of a loss from a business conducted by a partnership reduces the individual's net earnings from self-employment only to the extent that the individual's outside basis in the partnership is sufficient to allow him to deduct the loss in computing his regular income tax liability.

Moreover, the regulations interpreting section 1402(a) provide no apparent grounds for distinguishing between deductible partnership losses and those limited by section 704(d). Section 1.1402(a)-1(a)(2), Income Tax Regs., defines "net earnings from self-employment" to include two components, the second of which is an individual's "distributive share (whether or not distributed), as determined

[*52] under section 704, of the income (or minus the loss), described in section 702(a)( * * * [8]) and as computed under section 703, from any trade or business carried on by any partnership of which is he a member." The mandate that the individual's distributive share of a partnership loss be "determined under section 704" requires consideration of section 704(d). But section 704(d) does not reduce a partner's distributive share of a partnership loss; it reduces only the portion of that loss that is allowed as a deduction in computing the partner's regular taxable income. Losses not allowed as a deduction by reason of the section 704(d) limitation remain part of the partner's distributive share of the loss (and can be deducted in future years if the partner has a sufficient outside basis).

Given the conclusions reached supra part V, however, we need not resolve the question of whether a partner's distributive share of a loss incurred in a partnership trade or business reduces the partner's net earnings from self-employment only to the extent that the loss is deductible in determining the partner's regular tax liability under chapter 1 of subtitle A. As explained supra part V.A., we have concluded that petitioners have not established that Impact Medical allocated to Mr. Duffy any distributive share of the partnership's loss for 2012. And we concluded supra part V.B. that petitioners are entitled to deduct all of the $328,168 ordinary loss the partnership allocated to Mr. Duffy for 2013.

**[*53]** Because the deductible loss exceeds Mr. Duffy's guaranteed payments of $218,182 for the year, we conclude that Mr. Duffy had no net earnings from self-employment for 2013 regardless of whether his distributive share of the partnership's loss can be taken into account only to the extent that it is deductible under chapter 1.  Finally, we concluded <u>supra</u> part V.C. that petitioners are entitled to deduct a loss from Impact Medical for 2014 in an amount at least equal to Mr. Duffy's guaranteed payments for the year.  Therefore, even accepting the premise underlying respondent's position, Mr. Duffy had no net earnings from self-employment tax for 2014.[17]  We thus uphold respondent's determination of Mr. Duffy's self-employment tax liability for 2012 but not for 2013 or 2014.

## VIII.  <u>Penalties</u>

Section 6662(a) and (b)(1) provides for an accuracy-related penalty of 20% on the portion of an underpayment of tax attributable to negligence or disregard of rules and regulations.  Section 6662(a) and (b)(2) provides for the same penalty on the portion of an underpayment of tax attributable to "[a]ny substantial understatement of income tax."  Section 6662(d)(2)(A) generally defines the term "understatement" as the excess of the tax required to be shown on the return over

---

[17]Because neither Mr. Duffy nor Mrs. Duffy had net earnings from self-employment for 2014, they were not entitled to the $2,000 refundable child tax credit respondent allowed.  <u>See</u> secs. 24(d)(1), 32(c)(2).

[*54] the amount shown on the return as filed. In the case of an individual, an understatement is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). An understatement is reduced, however, by the portion attributable to the treatment of an item for which the taxpayer had "substantial authority" or, in the case of items adequately disclosed, a "reasonable basis". Sec. 6662(d)(2)(B). Section 6664(c)(1) provides an exception to the imposition of the section 6662(a) accuracy-related penalty if it is shown that there was reasonable cause for the underpayment and the taxpayer acted in good faith. Reliance on the advice of a professional tax adviser may constitute reasonable cause and good faith "if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6664-4(b)(1), Income Tax Regs.

Although taxpayers generally bear the burden of proof under Rule 142(a), section 7491(c) provides that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title." To meet his burden of production under section 7491(c), the Commissioner must produce evidence regarding the appropriateness of imposing the penalty. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner carries his burden of

**[\*55]** production, the taxpayer bears the burden of proving entitlement to relief because of substantial authority, adequate disclosure, or reasonable cause. See id. at 447.

The burden of production that section 7491(c) imposes on the Commissioner requires him to establish compliance with the supervisory approval requirement of section 6751(b). Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016). Section 6751(b)(1) provides: "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."

In support of his determination that petitioners are liable for accuracy-related penalties, respondent argues that petitioners demonstrated negligence in claiming that the Gearhart property was a business asset and by "fail[ing] to maintain records to establish their entitlement to claimed deductions and losses." He also argues that, as an arithmetic matter, "he has met his burden of establishing substantial understatements of taxes * * * for taxable years 2009 through 2013."

In claiming that he has met his burden of establishing compliance with section 6751(b), respondent refers to the parties' stipulation that "Supervisory

[*56] Internal Revenue Agent, also known as Exam Group Manager, Patricia Crespi, who was the manager or supervisor of one or more of the auditing revenue agents, signed a Civil Penalty Approval Form * * * with respect to the IRS's audit of petitioners' taxable years 2011 through 2014 inclusive." Respondent observes that the civil penalty approval form "approved the assertion of the accuracy-related penalty * * * on the grounds of negligence and substantial understatement of income taxes for taxable years 2011 through 2014". He claims that Ms. Crespi's approval was timely because she signed the civil penalty approval form "on August 13, 2015, which was before the notice of deficiency for taxable year 2012 was issued on December 16, 2015."[18]

Respondent suggests that specific approval of the penalties determined for 2009 and 2010 was unnecessary because "[t]he understatements and deficiencies for * * * [those] years * * * are computational adjustments due to the adjustments for petitioners' 2011 taxable year, including the disallowance of the Form 4897 [sic] ordinary losses * * * and the net operating loss carryback adjustments." Therefore, respondent claims, "the accuracy-related penalties for taxable years

[18]Although respondent is correct that Ms. Crespi signed the penalty approval form before the issuance of the notice of deficiency, he has his dates wrong. Ms. Crespi signed the form on December 16, 2015. The notice of deficiency, which covers all of the years in issue, not just 2012, is dated January 19, 2016.

**[*57]** 2009 and 2010 are also computational adjustments that were also approved as a part of Ms. Crespi's approval of the accuracy-related penalty for 2011 taxable year".

In her brief, Mrs. Duffy acknowledges that the returns she filed with her husband include "several errors", but she blames those errors on the accountants who prepared the returns. She contends that she and her husband "exercised reasonable care in having complete and accurate records which they then provided to * * * [their] CPA for the preparation of the returns in question." "This conduct," she claims, "reflects a standard of reasonable care sufficient to avoid the accuracy-related penalties provided for [sic] Internal Revenue Code Section 6662."

Respondent, in dismissing petitioners' reasonable cause argument, alleges that they

> did not establish that their tax return preparers were competent professionals who had sufficient expertise to justify reliance, what information and documents they provided to their tax return preparers much less that they provided the necessary and accurate information to the tax return preparers or advisors, they actually relied in good faith on the advisors' judgment, and the incorrect returns * * * were the result of the accountants' errors.

Consequently, respondent concludes, "petitioners could not have reasonably relied upon their tax return preparers for taxable years 2009 through 2014, inclusive, and

[*58] they failed to establish that they acted with reasonable cause and good faith."

We need not decide whether petitioners' reasonably relied on their return preparers because we conclude that respondent failed to meet the burden of production imposed on him by section 7491(c). In particular, respondent has not established compliance with the supervisory approval requirement of section 6751(b)(1). The civil penalty approval form included in the record establishes that Ms. Crespi approved the penalties for some of the years in issue, but respondent has not established that Ms. Crespi is "the immediate supervisor of the individual" who made the determination to assess penalties. See sec. 6751(b)(1). To establish that Ms. Crespi's approval complied with section 6751(b)(1), respondent relies on the parties' stipulation that she "was the manager or supervisor of one or more of the auditing revenue agents". The stipulation thus does not establish that Ms. Crespi was the immediate supervisor of the person who made the initial determination to assess the penalties in issue (whether that person was Ms. Kelly or someone else). According to the stipulation, Ms. Crespi supervised some of the agents involved in the audit but not necessarily all of them. Thus, the record does not demonstrate that Ms. Crespi was the immediate supervisor of the individual

**[\*59]** who made the initial determination to assess the penalties respondent seeks to impose.[19]

Because respondent has not met his burden of demonstrating compliance with section 6751(b)(1), petitioners are not subject to an accuracy-related penalty under section 6662 for any of the years in issue.

<u>Decision will be entered under</u>

<u>Rule 155</u>.

---

[19]Because respondent has not established that Ms. Crespi was the appropriate supervisor to approve the penalties in issue, we need not decide whether her approval of penalties for 2011 necessarily approved penalties for 2009 and 2010 as well.